John R. Parker, Jr,
California Bar No. 257761
**ALMEIDA LAW GROUP LLC**
3550 Watt Avenue, Suite 140
Sacramento, California 95821
Tel: (916) 616-2936
jrparker@almeidalawgroup.com

*Attorneys for Plaintiff & the Proposed Class*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TAMMY L. JULIAN,** *individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>**CITY OF HOPE NATIONAL MEDICAL CENTER** d/b/a **CITY OF HOPE**,<br><br>Defendant. | **CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND EQUITABLE RELIEF FOR:**<br><br>1. Negligence<br>2. Negligence Per Se<br>3. Breach of Implied Contract<br>4. Breach of Fiduciary Duty<br>5. Invasion of Privacy<br>6. Violation of the California Customer Records Act,<br>7. Cal. Civ. Code §§ 1798.80 et seq.<br>8. California Confidentiality of Medical Information Act,<br>9. Civil Code §§ 56, et seq.<br>10. California Unfair Competition Law<br>11. Cal. Bus. & Prof. Code §17200 et seq.<br>12. Declaratory Judgment<br>13. Unjust Enrichment<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Tammy L. Julian, individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby alleges the following against City of Hope National Medical Center d/b/a City of Hope ("Defendant"). Facts

1

pertaining to Plaintiff and her experiences and circumstances are alleged based upon personal knowledge and all other facts herein are alleged based upon the investigation of counsel and, where indicated, upon information and good faith belief.

## **NATURE OF THE ACTION**

1.     Plaintiff brings this class action lawsuit against Defendant for its failure to properly secure and safeguard Plaintiff's and other similarly situated current and former Defendant patients' (collectively defined herein as the "Class" or "Class Members") personally identifiable information ("PII") and protected health information ("PHI"), including names, dates of birth, Social Security numbers, Driver's licenses, health and health insurance information, and financial data (collectively, the "Private Information") from cybercriminals.

2.     Defendant is a medical treatment and research organization with locations in California, Arizona, Illinois, and Georgia[1].

3.     Defendant provides cancer research, treatment, and prevention healthcare services for "patients across the United States through [its] national footprint of cancer centers.[2]

4.     As part of its business, Defendant collects a treasure-trove of data from their patients, including highly sensitive Private Information.

5.     Healthcare providers that handle Private Information have an obligation to employ reasonable and necessary data security practices to protect the sensitive, confidential and personal information entrusted to them.

6.     This duty exists because it is foreseeable that the exposure of such Private Information to unauthorized persons—and especially hackers with

---

[1] *About City of Hope*, CITY OF HOPE, https://www.cityofhope.org/about-city-of-hope (last visited April 9, 2024)

[2] *Id.*

2

CLASS ACTION COMPLAINT

nefarious intentions—will result in harm to the affected individuals, including, but not limited to, medical and financial identity theft, invasion of their private health matters and other long-term issues.

7.     The harm resulting from a data and privacy breach manifests in several ways, including identity theft and financial and medical fraud, and the exposure of a person's Private Information through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives.

8.     Mitigating that risk requires individuals to devote significant time, money and other resources to closely monitor their credit, financial accounts, health records and email accounts, as well as to take a number of additional prophylactic measures.

9.     In this instance, all of that could have been avoided if Defendant had employed reasonable and appropriate data security measures.

10.     On April 4, 2024, Defendant announced that their patients' Private Information that had been entrusted to Defendant had been compromised, affecting at least 827,149 individuals (the "Data Breach").[3]

11.     The breach appears to have involved the divulgence of Private Information of Defendant's patients including their: name, contact information (e.g., email address, phone number), date of birth, social security number, driver's license or other government identification, financial details (e.g., bank account number and/or credit card details), health insurance information, medical records and information about medical history and/or associated conditions, and/or unique

---

[3] *See* https://www.bleepingcomputer.com/news/security/us-cancer-center-data-breach-exposes-info-of-827-000-patients/ (last visited April 9, 2024).

identifiers to associate individuals with City of Hope (e.g., medical record number).

12.     Thus, *despite discovering the Data Breach on or around October 13, 2023*, Defendant did not disclose the full scope of the Data Breach or the information impacted, until on or about April 4, 2024*, or over five months after the fact.*

13.     Moreover, on information and belief, Defendant failed to mount any meaningful investigation into the breach itself, the causes, or what specific information of Plaintiff and the proposed Class was lost to criminals.

14.     Defendant's "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach has been severely diminished.

15.     As a direct and proximate result of Defendant's failure to implement and to follow basic security procedures, Plaintiff's and Class Members' PII and PHI is now in the hands of cybercriminals.

16.     Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, Private Information being disseminated on the dark web, and similar forms of criminal mischief, risk which may last for the rest of their lives.

17.     Plaintiff and Class Members have also suffered concrete injuries in fact including, but not limited to, lost or diminished value of Private Information, lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, loss of benefit of the bargain, lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, and actual misuse of the compromised data consisting of an increase in

4

spam calls, texts, and/or emails.

18.     Consequently, Plaintiff and Class Members must devote substantially more time, money and energy to protect themselves, to the extent possible, from these crimes. *See McMorris v. Lopez*, 995 F.3d 295, 301 (2d Cir. 2021) (quoting *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015) ("Why else would hackers break into a store's database and steal consumers' private information? Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities.")).

19.     Plaintiff, on behalf of herself and all others similarly situated, therefore brings claims for (i) Negligence; (ii) Negligence *per se*; (iii) Breach of Implied Contract; (iv) Unjust Enrichment; (v) Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, (vi) Violation of the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, et. seq.*,* and (vii) Declaratory Judgment. Plaintiff seeks damages and injunctive relief, including the adoption of reasonably necessary and appropriate data security practices to safeguard the Private Information in Defendant's custody in order to prevent incidents like the Data Breach from occurring in the future.

## **PARTIES**

### *Plaintiff Tammy L. Julian*

20.     Plaintiff Tammy L. Julian is, and at all times mentioned herein, was an individual citizen residing in Los Angeles County, California, and was a patient of Defendant's facility in Duarte, California in approximately 2017 and 2018.

21.     Plaintiff understandably and reasonably believed and trusted that her Private Information provided to Defendant would be kept confidential and secure and would be used solely for authorized purposes.

### *Defendant City of Hope National Medical Center d/b/a City of Hope*

22.     Plaintiff is informed and believes that Defendant, City of Hope National Medical Center d/b/a City of Hope is a Nonprofit Corporation formed in

5

California and with its principal place of business at 1500 E Duarte Rd., Duarte, California 91010.

## JURISDICTION & VENUE

23.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than one or more Defendant.

24.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

25.     This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in this District. Further, Defendant is authorized to and regularly conducts business in this District and makes decisions regarding corporate governance and management of its business operations in this District, including decisions regarding the security of patients' Private Information.

26.     Venue is proper in this District under 28 U.S.C. § 1391(a)(1) through (d) because: a substantial part of the events giving rise to this action occurred in this District and Defendant has harmed Class Members residing in this District.

## COMMON FACTUAL ALLEGATIONS

### A.     *Defendant Collects a Significant Amount of Private Information.*

27.     Plaintiff is informed and believes that Defendant is a medical treatment and research organization with locations in California, Arizona, Illinois, and Georgia.[4]

---

[4] *About City of Hope*, CITY OF HOPE, https://www.cityofhope.org/about-city-of-hope (last visited April 5, 2024)

CLASS ACTION COMPLAINT

28.     Plaintiff and Class Members are current and former patients of Defendant.

29.     As a condition of receiving medical services from Defendant, patients are required to entrust it with highly sensitive personal and health information.

30.     While providing healthcare services, Defendant receives, creates, and handles an incredible amount of Private Information, including, *inter alia*, names, addresses, dates of birth, addresses, phone numbers, email addresses, Social Security numbers and medical information such as dates of service, diagnosis/treatment information, medical billing/claims information, health insurance information, and other information that Defendant may deem necessary to provide services and care.

31.     Patients are required to provide and to otherwise entrust their PII and PHI to Defendant to receive healthcare services and, in return, they reasonably and appropriately expect that Defendant will safeguard their highly sensitive Private Information and keep it secure and confidential.

32.     The information held by Defendant in its computer systems included the unencrypted Private Information of Plaintiff and Class Members.

33.     Upon information and good faith belief, Defendant made promises and representations to its patients that the Private Information collected from them as a condition of obtaining healthcare services at Defendant's facilities would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after they were no longer required to maintain it.

34.     Indeed, Defendant provides on its website that: "[w]e are required by law to maintain the privacy of your protected health information ("PHI"), to provide you with notice of our legal duties and privacy practices with respect to

CLASS ACTION COMPLAINT

your PHI, and to notify you in the event of a breach of your unsecured PHI."[5]

35.     Due to the highly sensitive and personal nature of the information Defendant acquires and stores with respect to its patients, Defendant is required to keep patients' Private Information private; comply with industry standards related to data security and the maintenance of their patients' Private Information; inform their patients of its legal duties relating to data security; comply with all federal and state laws protecting patients' Private Information; only use and release patients' Private Information for reasons that relate to the services they provide; and provide adequate notice to patients if their Private Information is disclosed without authorization.

36.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

37.     Without the required submission of Private Information from Plaintiff and Class Members, Defendant could not perform the services it provides.

38.     Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

39.     Defendant's actions and inactions directly resulted in the Data Breach and the compromise of Plaintiff's and Class Members' Private Information.

### B.     The Data Breach

40.     On or around April 4, 2024, Defendant announced that its patients' Private Information stored on their systems had been compromised affecting

---

[5] https://www.cityofhope.org/sites/www/files/2024-03/COH-Notice-of-Privacy-Practices-09-2023_English.pdf (last visited April 9, 2024)

CLASS ACTION COMPLAINT

827,149 individuals.[6]

41.     Defendant did not begin notifying patients impacted by the Data Breach until *more than five months after they learned of the Data Breach*.

42.     Defendant began sending Plaintiff and other Data Breach victims a Notice of Data Breach letter (the "Notice Letter"), informing them that:

> ### What Happened?
> On or about October 13, 2023, City of Hope became aware of suspicious activity on a subset of its systems and immediately instituted mitigation measures to minimize any disruption to its operations. City of Hope launched an investigation into the nature and scope of the incident with the assistance of a leading cybersecurity firm, which determined that an unauthorized third party accessed a subset of our systems and obtained copies of some files between September 19, 2023, and October 12, 2023. City of Hope has undertaken a detailed review of the copied files to determine the incident's impact and has determined that some of these files may have contained your information.
>
> ### What Information Is Involved?
> While the investigation remains ongoing, the impacted personal information identified thus far varies by individual but may have included name, contact information (e.g., email address, phone number), date of birth, social security number, driver's license or other government identification, financial details (e.g., bank account number and/or credit card details), health insurance information, medical records and information about medical history and/or associated conditions, and/ or unique identifiers to associate individuals with City of Hope (e.g., medical record number).[7]

---

[6] *See https://www.cityofhope.org/notice-of-data-security-incident* (last visited April 5, 2024).

[7] The "Notice Letter". A sample copy is available at

9

43. Omitted from the Notice Letter were the identity of the cybercriminals who perpetrated this Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

44. Although the Notice Letter is lacking in details, it does provide the following: a) that this Data Breach was the work of cybercriminals; b) that the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data; and c) that once inside Defendant's networks and systems, the cybercriminals targeted information including Plaintiff's and Class Members' Social Security numbers, PHI, and other sensitive information for download and theft.

45. Defendant had obligations created by the FTC Act, HIPAA, contract, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

46. The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures, and its failure to follow its own policies, in order to protect its patients' PII and PHI.

**C.** ***Defendant Knew the Risks of Storing Valuable Private Information & the Foreseeable Harm to Victims.***

47. Defendant was well aware that the Private Information it collects is

https://ago.vermont.gov/sites/ago/files/documents/2024-04-02%20City%20of%20Hope%20Data%20Breach%20Notice%20to%20Consumers.pdf (last visited April 9, 2024)

CLASS ACTION COMPLAINT

highly sensitive and of significant value to those who would use it for wrongful purposes.

48.     Defendant also knew that a breach of its systems—and exposure of the information stored therein—would result in the increased risk of identity theft and fraud (financial and medical) against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

49.     These risks are not merely theoretical; in recent years, numerous high-profile data breaches have occurred at businesses such as Equifax, Facebook, Yahoo, Marriott, Anthem as well as countless ones in the healthcare industry.

50.     PII has considerable value and constitutes an enticing and well-known target to hackers, who can easily sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[8]

51.     PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.[9]

52.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities.

53.     In 2021 alone, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in

---

[8] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited April 9, 2024).

[9] *See* Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited April 9, 2024).

the total number of data breaches.[10]

54.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years; for instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[11]

55.    The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[12]

56.    Additionally, healthcare providers "store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it quickly – making the industry a growing target."[13]

57.    Indeed, cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in

---

[10] *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://go.flashpoint-intel.com/docs/2021-Year-End-Report-data-breach-quickview (last visited April 9, 2024).

[11]  *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited April 9, 2024).

[12] *The healthcare industry is at risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/  (last visited April 9, 2024).

[13]  *Id.*

2020.[14]

58.     The healthcare sector suffered about 337 breaches in the first half of 2022 alone according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[15]

59.     The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's patients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud and more.

60.     As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "[m]edical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[16]

61.     A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market whereas stolen payment card information sells for about $1.[17] According to Experian:

---

[14] *2022 Breach Barometer*, https://www.protenus.com/breach-barometer-report (last visited April 9, 2024).

[15] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year (last visited April 9, 2024).

[16] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited April 9, 2024).

[17] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, https://www.pwc.com/gx/en/consulting-

13

Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[18]

62.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more

---

services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf  (last visited April 9, 2024).

[18] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited April 9, 2024).

CLASS ACTION COMPLAINT

information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

63.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

64.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

65.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[19] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

---

[19] *See* https://www.identitytheft.gov/Steps (last visited April 9, 2024).

CLASS ACTION COMPLAINT

66.     Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including medical identity theft, credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information.

67.     For example, Social Security numbers, which were compromised in the Data Breach, are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[20]

68.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing

---

[20] *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf  (last visited April 9, 2024).

fraud activity to obtain a new number.

69.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[21]

70.    There may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused.

71.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[22]

72.    Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as

---

[21] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back* (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft  (last visited April 9, 2024).

[22] *Report to Congressional Requesters, Personal Information* (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited April 9, 2024).

name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

73.     Based on the value of its patients' PII and PHI to cybercriminals, Defendant certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

### D.     The Data Breach was Preventable.

74.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

75.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

76.     To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented numerous measures as recommended by the United States Government, including but not limited to:

- Implementing an awareness and training program.

- Enabling strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scanning all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configuring firewalls to block access to known malicious IP addresses.

- Setting anti-virus and anti-malware programs to conduct regular scans automatically.

- Managing the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.[23]

77.    Given that Defendant was storing the Private Information of its current and former patients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

78.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of more than eight hundred thousand individuals, including that of Plaintiff and Class Members.

**E.    Defendant is Obligated Under HIPAA to Safeguard Private Information.**

79.    Defendant is required by HIPAA to safeguard patient PHI.

80.    Defendant is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

81.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

82.    Further to 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

83.    Under C.F.R. 160.103, HIPAA defines "individually identifiable

---

[23] How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited April 9, 2024).

19

CLASS ACTION COMPLAINT

health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

84.     HIPAA requires Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 CFR § 164.102, *et. seq*.

85.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[24]

86.     While HIPAA permits healthcare providers to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers to disclose PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

87.     As such, Defendant is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it requires, receives, and collects, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

---

[24] *Breach Notification Rule*, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html. (last visited April 9, 2024)

88.     Given the application of HIPAA to Defendant, and that Plaintiff and Class Members entrusted their PHI to Defendant in order to receive healthcare services, Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

**F.      FTC Guidelines Prohibit Defendant from Engaging in Unfair or Deceptive Acts or Practices.**

89.     Defendant is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

90.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[25]

91.     The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[26]

92.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data;

---

[25] *Start with Security – A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited April 9, 2024)

[26] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited April 9, 2024)

require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[27]

93.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

94.    Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

95.    Defendant was at all times fully aware of its obligations to protect the PII and PHI of patients because of its position as a healthcare provider, which gave it direct access to reams of patient PII and PHI. Defendant was also aware of the significant repercussions that would result from its failure to do so.

## G.    *Defendant Violated Industry Standards.*

96.    Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Hope failed to follow these industry best practices, including a failure to implement multi-factor authentication.

---

[27] *Id.*

CLASS ACTION COMPLAINT

97.     Other best cybersecurity practices that are standard for healthcare entities include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

98.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

99.     These foregoing frameworks are existing and applicable industry standards for healthcare entities, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**H.     The Monetary Value of Plaintiff's & Class Members' Private Information.**

100.   As a result of Defendant's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their Private Information.

101.   From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity

23

fraud. Without a data breach, the likelihood of identifying fraud is only about 3%.[28]

102.   "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[29]

103.   The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[30]

104.   Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information on multiple underground Internet websites, commonly referred to as the dark web.

105.   At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third-party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[31]

---

[28] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited April 9, 2024).

[29] *Id.*

[30] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited April 9, 2024).

[31] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-

1

2      106.   Commissioner Swindle's 2001 remarks are even more relevant today,

3  as consumers' personal data functions as a "new form of currency" that supports a

4  $26 Billion per year online advertising industry in the United States.[32]

5      107.   The FTC has also recognized that consumer data is a new (and

6  valuable) form of currency. In an FTC roundtable presentation, another former

7  Commissioner, Pamela Jones Harbour, underscored this point:

8          Most consumers cannot begin to comprehend the types
           and amount of information collected by businesses, or why
9          their information may be commercially valuable. Data is
           currency. The larger the data set, the greater potential for
10         analysis—and profit.[33]

11

12      108.   Recognizing the high value that consumers place on their Private

13  Information, many companies now offer consumers an opportunity to sell this

14  information.[34]  The idea is to give consumers more power and control over the type

15  of information that they share and who ultimately receives that information.  And,

16  by making the transaction transparent, consumers will make a profit from their

17  Private Information. This business has created a new market for the sale and

18  purchase of this valuable data.

19  _____

20  marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited
    April 9, 2024).

21

22  [32] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy* (Feb. 28,
    2011),

23  https://www.wsj.com/articles/SB10001424052748703529004576160764037920274
    (last visited April 9, 2024).

24

25  [33] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC
    Exploring Privacy Roundtable* (Dec. 7, 2009),

26  https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-
    exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited April 9,

27  2024).

28  [34] Angwin & Steel, *supra* note 34.

                                            25

109.   Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[35]

110.   The value of Plaintiff's and Class Members' Private Information on the black market is substantial. Sensitive health information can sell for as much as $363.[36]

111.   This information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

112.   Health information, in particular, is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[37]

113.   "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[38]

---

[35] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited April 9, 2024).

[36] *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited April 9, 2024).

[37] *Id.*

[38] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, https://www.experian.com/innovation/thought-

26

114.   Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[39]

115.   The Federal Trade Commission has warned consumers of the dangers of medical identity theft, stating that criminals can use personal information like a "health insurance account number or Medicare number" to "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." The FTC further warns that instances of medical identity theft "could affect the medical care you're able to get or the health insurance benefits you're able to use[,]" while also having a negative impact on credit scores.[40]

116.   Here, where health insurance information was among the Private Information impacted in the Data Breach, Plaintiff's and Class Members' risk of suffering future medical identity theft is especially substantial.

117.   The ramifications of Defendant's failure to keep its patients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

---

leadership/medical-identity-theft-healthcare-data-breaches.jsp (last visited April 9, 2024).

[39] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/ (last visited April 9, 2024).

[40] *What to Know About Medical Identity Theft*, What To Know About Medical Identity Theft | Consumer Advice (ftc.gov) (last visited April 9, 2024).

Fraudulent activity might not show up for 6 to 12 months or even longer.

118.   Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[41] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[42]

119.   Indeed, when compromised, healthcare-related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[43]

120.   Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft, including medical identity theft, have a crippling effect on

---

[41] *See Medical ID Theft Checklist*, IDENTITYFORCE, https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited April 9, 2024).

[42] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches* (Apr. 2010), https://www.experian.com/innovation/thought-leadership/medical-identity-theft-healthcare-data-breaches.jsp  (last visited April 9, 2024).

[43] Elinor Mills, *Study: Medical identity theft is costly for victims* (March 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited April 9, 2024).

individuals and detrimentally impact the economy as a whole.[44]

121.   At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft (including medical identity theft) and fraud.

122.   Upon information and good faith belief, had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it would have prevented the ransomware attack into their systems and, ultimately, the theft of the Private Information of patients within their systems.

123.   The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves.

124.   Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[45] For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[46]

---

[44] *Id.*

[45] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, at 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework (last visited April 9, 2024).

[46] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

29

125.   Based upon information and belief, the unauthorized parties have already utilized, and will continue utilize, the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class Members that can be misused.

126.   In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

127.   Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

128.   Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiffs.

129.   Given these facts, any company that transacts business with customers and then compromises the privacy of customers' Private Information has thus deprived customers of the full monetary value of their transaction with the company.

130.   In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

**I.      *Plaintiff & Class Members Have Suffered Compensable Damages.***

131.   For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways.

132.   The risks associated with identity theft, including medical identity

30

theft, are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

133. In order to mitigate against the risks of identity theft and fraud, Plaintiff and members of the Class must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

134. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

135. Further, the value of Plaintiff and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

136. Plaintiff and Class Members now face a greater risk of identity theft, including medical and financial identity theft.

137. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training

CLASS ACTION COMPLAINT

measures to protect its patients' PII and PHI.

138.   Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

139.   Plaintiff and Class Members also did not receive the full benefit of their bargain when paying for medical services. Instead, they received services of a diminished value to those described in their agreements with Defendant. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

140.   Plaintiff and Class Members would not have obtained services from Defendant had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

141.   Finally, in addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

## **REPRESENTATIVE PLAINTIFF'S EXPERIENCE**

### *Plaintiff Tammy L. Julian*

142.   Plaintiff Tammy L. Julian was a patient at one of Defendant's Duarte, California facility in or around 2017 and 2018.  She had procedure there in approximately 2017 and had follow-up appointments in approximately 2017 and 2018 and used Defendant's website.

143.   As a condition of obtaining healthcare services at Hope, she was required to provide her Private Information to Defendant, including her name, date of birth, contact information, health insurance information, Social Security number, and other sensitive information.

32

144.   At the time of the Data Breach—September 19, 2023 through October 12, 2023--Defendant maintained Plaintiff's Private Information in its system.

145.   Plaintiff Julian is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant, or used Defendant's services at all, had she known of Defendant's lax data security policies and procedures.

146.   On April 7, 2024, Plaintiff Julian reviewed for the first time a Notice Letter that she received by U.S. Mail directly from Defendant, which was dated April 2, 2024. According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties, including her name, contact information (e.g., email address, phone number), date of birth, social security number, driver's license or other government identification, financial details (e.g., bank account number and/or credit card details), health insurance information, medical records and information about medical history and/or associated conditions, and/ or unique identifiers to associate individuals with City of Hope (e.g., medical record number).

147.   As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff to "remain vigilant to protect against potential fraud and identity theft by reviewing your account statements, monitoring your credit reports, and notifying your financial institutions of any potential suspicious activity[,]"[47] Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services, and

---

[47] Notice Letter

monitoring her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

148. Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

149. Plaintiff additionally suffered actual injury in the form of her Private Information being disseminated, on information and belief, on the dark web as a result of the Data Breach.

150. Plaintiff additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her PII was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

CLASS ACTION COMPLAINT

151.   The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

152.   As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

153.   As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

154.   Plaintiff Julian has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

155.   Plaintiff brings this class action on behalf of herself and all other individuals who are similarly situated pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

156.   Plaintiff seeks to represent a Nationwide Class of persons to be defined as follows:

> **All individuals residing in the United States whose PII and/or PHI was compromised in the Defendant's Data Breach which occurred in or about 2023 and was reported by Defendant in April 2024 (the "Nationwide Class").**

157.   In addition, or in the alternative, Plaintiff proposes the following California Sub-Class definition, subject to amendment as appropriate (together with the Nationwide Class, the "Class"):

> **All California residents whose PII and/or PHI was compromised in the Defendant's Data Breach which occurred in or about 2023 and was reported by Defendant in April 2024 (the "California Sub-Class").**

CLASS ACTION COMPLAINT

158.   Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families, all judges assigned to hear any aspect of this litigation, their immediate family members, and those individuals who make a timely and effective election to be excluded from this matter using the correct protocol for opting out.

159.   This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

160.   **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes many thousands of individuals, if not substantially more.

161.   **Commonality:** This action involved questions of law and fact common to the Class that predominate over any questions affecting solely individual members of the Class. Such common questions include but are not limited to:

a.   Whether Defendant failed to timely notify Plaintiff and Class Members of the Data Breach;

b.   Whether Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

c.   Whether Defendant had respective duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

36

CLASS ACTION COMPLAINT

d.      Whether Defendant had respective duties not to disclose the PII and PHI of Plaintiff and Class Members for non-business purposes;

e.      Whether Defendant failed to adequately safeguard the PII and PHI of Plaintiff and Class Members;

f.      Whether and when Defendant actually learned of the Data Breach;

g.      Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

h.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII and PHI had been compromised;

i.      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

j.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

k.      Whether Defendant adequately addressed and fixed the vulnerabilities that allowed the Data Breach to occur;

l.      Whether Defendant was negligent and that negligence resulted in the Data Breach;

m.      Whether Defendant entered into an implied contract with Plaintiff and Class Members;

n.      Whether Defendant breached that contract by failing to adequately safeguard Plaintiff's and Class Members' PII and PHI;

o.      Whether Defendant were unjustly enriched;

p.      Whether Plaintiff and Class Members are entitled to actual, statutory, and/or nominal damages as a result of Defendant's wrongful conduct; and

q.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

37

CLASS ACTION COMPLAINT

162.   **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class were all patients, or family members or caregivers of patients, of Defendant, each having their PII and PHI exposed and/or accessed by an unauthorized third party.

163.   **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

164.   **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and have no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

165.   **Superiority and Manageability:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

166.   Class action Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

167.   The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

168.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

CLASS ACTION COMPLAINT

169.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

170.   Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

171.   Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

172.   Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendant failed to timely notify the Plaintiff and the class of the Data Breach;

b.   Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.   Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.   Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.   Whether Defendant failed to take commercially reasonable steps to safeguard patient Private Information; and Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

173. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

174. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

175. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through Defendant's books and records.

## CALIFORNIA LAW SHOULD APPLY TO PLAINTIFF'S & CLASS MEMBERS' COMMON LAW CLAIMS

176. The State of California has a significant interest in regulating the conduct of businesses operating within its borders.

177. The State of California has a significant interest in regulating the conduct of businesses operating within its borders.

178. California, which seeks to protect the rights and interests of California and all residents and citizens of the United States against a company headquartered and doing business in California, has a greater interest in the claims of Plaintiff and the Classes than any other state and is most intimately concerned with the claims and outcome of this litigation.

179. The principal place of business and headquarters of Defendant, located in California, is the "nerve center" of its business activities—the place

41

CLASS ACTION COMPLAINT

where their high-level officers direct, control and coordinate their activities, including major policy, financial and legal decisions.

180.   Upon information and good faith belief, Defendant's actions and corporate decisions surrounding the allegations made in the Complaint were made from and in California.

181.   Defendant's breaches of duty to Plaintiff and Class Members emanated from California.

182.   Application of California law to the Classes with respect to Plaintiff's and the Classes' common law claims is neither arbitrary nor fundamentally unfair because, further to choice of law principles applicable to this action, the common law of California applies to the nationwide common law claims of all Class members. Additionally, given California' significant interest in regulating the conduct of businesses operating within its borders, and that California has the most significant relationship to Defendant, as most of them are headquartered and incorporated in California, and all of them are located in and doing business there, there is no conflict in applying California law to non-resident consumers such as Plaintiff and Class Members. Alternatively, and/or in addition to California law, the laws set forth below apply to the conduct described herein.

## CAUSES OF ACTION

## COUNT I

### Negligence

### (*On behalf of Plaintiff & the Nationwide Class*)

183.   Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

184.   Plaintiff brings this claim individually and on behalf of the Class.

185.   Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in Defendant's possession

42

1  from being compromised, lost, stolen, accessed, and misused by unauthorized

2  persons.

3      186.   Defendant's duty to use reasonable care arose from several sources,

4  including but not limited to those described below.

5      187.   Defendant had a common law duty to prevent foreseeable harm to

6  others. This duty existed because Plaintiff and Class Members were the foreseeable

7  and probable victims of any inadequate security practices on the part of the

8  Defendant. By collecting and storing valuable PII and PHI that is routinely targeted

9  by criminals for unauthorized access, Defendant was obligated to act with

10  reasonable care to protect against these foreseeable threats.

11      188.   Defendant's duty also arose from Defendant's position as healthcare

12  provider. Defendant holds itself out as trusted providers of healthcare, and thereby

13  assumes a duty to reasonably protect its patients' information. Indeed, Defendant

14  was in a unique and superior position to protect against the harm suffered by

15  Plaintiff and Class Members as a result of the Data Breach.

16      189.   Defendant breached the duties owed to Plaintiff and Class Members

17  and thus were negligent. As a result of a successful attack directed towards

18  Defendant that compromised Plaintiff's  and Class Members' PII and PHI,

19  Defendant breached its duties through some combination of the following errors

20  and omissions that allowed the data compromise to occur: (a) mismanaging its

21  system and failing to identify reasonably foreseeable internal and external risks to

22  the security, confidentiality, and integrity of patient information that resulted in the

23  unauthorized access and compromise of PII and PHI; (b) mishandling its data

24  security by failing to assess the sufficiency of its safeguards in place to control

25  these risks; (c) failing to design and implement information safeguards to control

26  these risks; (d) failing to adequately test and monitor the effectiveness of the

27  safeguards' key controls, systems, and procedures; (e) failing to evaluate and

28  adjust its information security program in light of the circumstances alleged herein;

43

(f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to their patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

190.   But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

191.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

a.   Theft of their PII and/or PHI;

b.   Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.   Costs associated with purchasing credit monitoring and identity theft protection services;

d.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.   The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.   Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.   Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

44

i.      Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j.      The diminished value of the services they paid for and received, and

k.      Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

192.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT II

### Negligence *Per Se*

### (*On behalf of Plaintiff & the Nationwide Class*)

193.   Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

194.   Plaintiff brings this claim individually and on behalf of the Class.

195.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

196.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI they obtained and stored and the foreseeable consequences of a data breach involving PII and PHI of their patients.

197.   Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

198.   Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

199.   Defendant is an entity covered under HIPAA which sets minimum federal standards for privacy and security of PHI.

200.   Pursuant to HIPAA, 42 U.S.C. § 1302d, *et. seq.*, and its implementing regulations, Defendant had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

201.   Specifically, HIPAA required Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

202.   Defendant violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI and by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI.

203.   Plaintiff and the Class Members are patients within the class of persons HIPAA was intended to protect.

204.   Defendant's violation of HIPAA constitutes negligence *per se*.

205.   The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act and HIPAA were intended to guard against.

206.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

46

CLASS ACTION COMPLAINT

207.   Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, Defendant owed, and continue to owe, a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive Private Information.

208.   Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

209.   Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship that existed between Defendant and its facilities' patients, which is recognized by statute, regulations, and the common law.

210.   In addition, Defendant had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

211.   Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (1) secure Plaintiff's and Class Members' Private Information and (2) comply with industry-standard data security practices.

212.   As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' Private Information, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

47

213.   Defendant's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted (and continue to constitute) negligence at common law.

214.   Plaintiff and the Class are entitled to recover damages in an amount to be determined at trial.

## COUNT III

### Breach of Implied Contract

### (*On behalf of Plaintiff & the Nationwide Class*)

215.   Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

216.   Plaintiff brings this claim individually and on behalf of the Class.

217.   When Plaintiff and Class Members provided their PII and PHI to Defendant, they entered into implied contracts with Defendant, under which Defendant agreed to take reasonable steps to protect Plaintiff's and Class Members' PII and PHI, comply with their statutory and common law duties to protect Plaintiff's and Class Members' PII and PHI, and to timely notify them in the event of a data breach.

218.   Defendant solicited and invited Plaintiff and Class Members to provide their PII and PHI as part of Defendant's provision of healthcare services. Plaintiff and Class Members accepted Defendant's offers and provided their PII and PHI to Defendant.

219.   Implicit in the agreement between Plaintiff and Class Members and Defendant, was Defendant's obligation to: (a) use such PII and PHI for business purposes only; (b) take reasonable steps to safeguard Plaintiff's and Class Members' PII and PHI; (c) prevent unauthorized access and/or disclosure of Plaintiff's and Class Members' PII and PHI; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or disclosure of their PII and PHI; (e) reasonably safeguard and protect the PII

48

and PHI of Plaintiff and Class Members from unauthorized access and/or disclosure; and (f) retain Plaintiff's and Class Members' PII and PHI under conditions that kept such information secure and confidential.

220. When entering into implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with their statutory and common law duties to adequately protect Plaintiff's and Class Members' PII and PHI and to timely notify them in the event of a data breach.

221. Plaintiff and Class Members paid money to Defendant in exchange for services, along with Defendant's promise to protect their PII and PHI from unauthorized access and disclosure. Plaintiff and Class Members reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

222. Plaintiff and Class Members would not have provided their PII and PHI to Defendant had they known that Defendant would not safeguard their PII and PHI, as promised, or provide timely notice of a data breach.

223. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

224. Defendant breached its implied contracts with Plaintiff and Class Members by failing to safeguard their PII and PHI and by failing to provide them with timely and accurate notice of the Data Breach

225. The losses and damages Plaintiff and Class Members sustained, include, but are not limited to:

  a. Theft of their PII and/or PHI;
  b. Costs associated with purchasing credit monitoring and identity theft protection services;
  c. Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;
  d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

49

e.      Costs associated with time spent and the loss of
productivity from taking time to address and attempt to ameliorate,
mitigate, and deal with the actual and future consequences of the Data
Breach – including finding fraudulent charges, cancelling and reissuing
cards, enrolling in credit monitoring and identity theft protection
services, freezing and unfreezing accounts, and imposing withdrawal
and purchase limits on compromised accounts;

f.      The imminent and certainly impending injury flowing
from the increased risk of potential fraud and identity theft posed by
their PII and/or PHI being placed in the hands of criminals;

g.      Damages to and diminution in value of their PII and PHI
entrusted, directly or indirectly, to Defendant with the mutual
understanding that Defendant would safeguard Plaintiff's and Class
Members' data against theft and not allow access and misuse of their
data by others;

h.      Continued risk of exposure to hackers and thieves of their
PII and/or PHI, which remains in Defendant's possession and is subject
to further breaches so long as Defendant fail to undertake appropriate
and adequate measures to protect Plaintiff's and Class Members' data;

i.      Future costs in terms of time, effort, and money that will
be expended as a result of the Data Breach for the remainder of the
lives of Plaintiff and Class Members;

j.      The diminished value of the services they paid for and
received; and

k.      Emotional distress from the unauthorized disclosure of PII
and PHI to strangers who likely have nefarious intentions and now have
prime opportunities to commit identity theft, fraud, and other types of
attacks on Plaintiff and Class Members.

226.   As a direct and proximate result of Defendant's breach of contract,
Plaintiff and Class Members are entitled to damages, including compensatory,
punitive, and/or nominal damages, in an amount to be proven at trial.

227.   Plaintiff and Class Members are also entitled to injunctive relief
requiring Defendant to, *e.g.*, (1) strength its data security systems and monitoring
procedures; (2) submit to future annual audits of those systems and monitoring
procedures; and (3) immediately provide and continue to provide adequate credit
monitoring to Plaintiff and all Class Members.

CLASS ACTION COMPLAINT

## COUNT IV

### Breach of Fiduciary Duty

### (*On behalf of Plaintiff & the Nationwide Class*)

228.   Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

229.   Given the relationship between Defendant and Plaintiff and Class members, where Defendant became guardian of Plaintiff's and Class members' PII/PHI, Defendant became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII/PHI; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

230.   Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII/PHI.

231.   Because of the highly sensitive nature of the PII/PHI, Plaintiff and Class members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII/PHI had they known the reality of Defendant's inadequate data security practices.

232.   Defendant breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII/PHI.

233.   Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

234.   As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

51

# COUNT V

## Invasion of Privacy

### *(On behalf of Plaintiff & the Nationwide Class)*

235.   Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

236.   Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

237.   Defendant owed a duty to its current and former patients, including Plaintiff and the Class, to keep this information confidential.

238.   The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class members' PII/PHI is highly offensive to a reasonable person.

239.   The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

240.   The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

241.   Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

242.   Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby

CLASS ACTION COMPLAINT

materially impairing their mitigation efforts.

243.   Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

244.   As a proximate result of Defendant's acts and omissions, the private and sensitive PII/PHI of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

245.   And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

246.   Unless and until enjoined and restrained by order of this Court,

247.   Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII/PHI are still maintained by Defendant with their inadequate cybersecurity system and policies.

248.   Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiff and the Class.

249.  In addition to injunctive relief, Plaintiff, on behalf of herself and the other Class members, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## COUNT VI

### Violation of the California Customer Records Act,

### Cal. Civ. Code §§ 1798.80 et seq.

### *(On Behalf of Plaintiff and the California Subclass)*

250.   Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

53

251.   Plaintiff brings this claim individually and on behalf of the California Subclass Class (the "Class" for purposed of this count).

252.   Cal. Civ. Code § 1798.81.5 provides that "[i]t is the intent of the Legislature to ensure that personal information about California residents is protected. To that end, the purpose of this section is to encourage businesses that own, license, or maintain personal information about Californians to provide reasonable security for that information."

253.   Section 1798.81.5(b) further states that: "[a] business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

254.   Cal. Civ. Code § 1798.84(b) provides that [a]ny customer injured by a violation of this title may institute a civil action to recover damages." Section 1798.84(e) further provides that "[a]ny business that violates, proposes to violate, or has violated this title may be enjoined."

255.   Plaintiff and the Class Members are "customers" within the meaning of Civ. Code § 1798.80(c) and 1798.84(b) because they are individuals who provided personal information to Defendant for the purpose of obtaining a product and/or service from Defendant.

256.   The personal information of Plaintiff and the Class Members at issue in this lawsuit constitutes "personal information" under § 1798.81.5(d)(1) in that the personal information Defendant collects and which was impacted by the cybersecurity attack includes an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements, with either the name or the data elements not encrypted or redacted: (i) Social Security number; (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification

CLASS ACTION COMPLAINT

number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

257.   Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the Plaintiff's and Class Members' personal information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiff and the Class Members. Specifically, Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information of Plaintiff and the Class Members from unauthorized access, destruction, use, modification, or disclosure. Defendant further subjected Plaintiff's and the Class Members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

258.   As a direct and proximate result of Defendant's violation of its duty, the unauthorized access, destruction, use, modification, or disclosure of the personal information of Plaintiff and the Class Members included hackers' access to, removal, deletion, destruction, use, modification, disabling, disclosure and/or conversion of the personal information of Plaintiff and the Class Members by the cyber attackers and/or additional unauthorized third parties to whom those

CLASS ACTION COMPLAINT

cybercriminals sold and/or otherwise transmitted the information.

259.   As a direct and proximate result of Defendant's acts or omissions, Plaintiff and the Class Members were injured and lost money or property including, but not limited to, the loss of Plaintiff's and the Class Members' legally protected interest in the confidentiality and privacy of their personal information, nominal damages, and additional losses described above. Plaintiff seeks compensatory damages as well as injunctive relief pursuant to Cal. Civ. Code § 1798.84(b).

260.   Moreover, the California Customer Records Act further provides: "A person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of the breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82.

261.   Any person or business that is required to issue a security breach notification under the CRA must meet the following requirements under §1798.82(d):

    a.  The name and contact information of the reporting person or business subject to this section;

    b.  A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

    c.  If the information is possible to determine at the time the notice is provided, then any of the following:

        i.   the date of the breach,

        ii.  the estimated date of the breach, or

        iii. the date range within which the breach occurred. The notification shall also include the date of the notice;

56

d.  Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

e.  A general description of the breach incident, if that information is possible to determine at the time the notice is provided;

f.  The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a social security number or a driver's license or California identification card number;

g.  If the person or business providing the notification was the source of the breach, an offer to provide appropriate identity theft prevention and mitigation services, if any, shall be provided at no cost to the affected person for not less than 12 months along with all information necessary to take advantage of the offer to any person whose information was or may have been breached if the breach exposed or may have exposed personal information.

262.  Defendant failed to provide the legally compliant notice under § 1798.82(d) to Plaintiff and members of the Class. On information and belief, to date, Defendant has not sent written notice of the data breach to all impacted individuals. As a result, Defendant has violated § 1798.82 by not providing legally compliant and timely notice to all Class Members. Because not all members of the class have been notified of the breach, members could have taken action to protect their personal information, but were unable to do so because they were not timely notified of the breach.

263.  On information and belief, many Class Members affected by the breach have not received any notice at all from Defendant in violation of Section 1798.82(d).

264.  As a result of the violations of Cal. Civ. Code § 1798.82, Plaintiff and Class Members suffered incrementally increased damages separate and distinct

57

from those simply caused by the breaches themselves.

265.   As a direct consequence of the actions as identified above, Plaintiff and Class Members incurred additional losses and suffered further harm to their privacy, including but not limited to economic loss, the loss of control over the use of their identity, increased stress, fear, and anxiety, harm to their constitutional right to privacy, lost time dedicated to the investigation of the breach and effort to cure any resulting harm, the need for future expenses and time dedicated to the recovery and protection of further loss, and privacy injuries associated with having their sensitive personal, financial, and payroll information disclosed, that they would not have otherwise incurred, and are entitled to recover compensatory damages according to proof pursuant to § 1798.84(b).

## COUNT VII

### California Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq*.

#### (*On behalf of Plaintiff & the California Class*)

266.   Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

267.   Under the California Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq*. (hereinafter referred to as the "CMIA"), "medical information" means "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." Cal. Civ. Code § 56.05.

268.   Additionally, Cal. Civ. Code § 56.05 defines "individually identifiable" as meaning that "the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address,

telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." Cal. Civ. Code § 56.05.

269.  Under Cal. Civ. Code § 56.101(a) of the CMIA,

(a) Every provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein.

Any provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36.

Cal. Civ. Code § 56.101.

270.   At all relevant times, Defendant was a health care contractor within the meaning of Civil Code § 56.05(d) because it is a "medical group, independent practice association, pharmaceutical benefits manager, or medical service organization and is not a health care service plan or provider of health care." In the alternative, Defendant is a health care provider within the meaning of Civil Code § 56.06(b) because it maintains medical information as defined by Civil Code § 56.05.

271.   Plaintiff and Class Members are Defendant's patients, as defined in Civil Code § 56.05(k).

272.   Plaintiff and Class Members provided their personal medical information to Defendant.

273.  At all relevant times, Defendant created, maintained, preserved, stored, abandoned, destroyed, or disposed of medical information in the ordinary

59

1   course business.

2       274.   As a result of the Data Breach, Defendant has misused, disclosed,

3   and/or allowed third parties to access and view Plaintiff's and Class Members'

4   personal medical information without their written authorization compliant with

5   the provisions of Civil Code §§ 56, et seq. As a further result of the Data Breach,

6   the confidential nature of the plaintiff's medical information was breached as a

7   result of Defendant's negligence. Specifically, Defendant knowingly allowed and

8   affirmatively acted in a manner that actually allowed unauthorized parties to

9   access and view Plaintiff's and Class Members' Private Information, which was

10  viewed and used when the unauthorized parties engaged in the above-described

11  fraudulent activity. Defendant's misuse and/or disclosure of medical information

12  regarding Plaintiff and Class Members constitutes a violation of Civil Code §§

13  56.10, 56.11, 56.13, and 56.26.

14      275.   As a direct and proximate result of Defendant's wrongful actions,

15  inaction, omissions, and want of ordinary care, Plaintiff's and Class Members'

16  personal medical information was disclosed without written authorization.

17      276.   By disclosing Plaintiff's and Class Members' Private Information

18  without their written authorization, Defendant violated California Civil Code § 56,

19  et seq., and its legal duty to protect the confidentiality of such information.

20      277.   Defendant also violated Sections 56.06 and 56.101 of the California

21  CMIA, which prohibit the negligent creation, maintenance, preservation, storage,

22  abandonment, destruction or disposal of confidential personal medical

23  information.

24      278.   As a direct and proximate result of Defendant's wrongful actions,

25  inaction, omissions, and want of ordinary care that directly and proximately

26  caused the Data Breach, Plaintiff's and Class Members' personal medical

27  information was viewed by, released to, and disclosed to third parties without

28  Plaintiff's and Class Members' written authorization.

As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violation of the CMIA, Plaintiff and Class Members are entitled to (i) actual damages, (ii) nominal damages of $1,000 per Plaintiff and Class Member, (iii) punitive damages of up to $3,000 per Plaintiff and Class Member, and (iv) attorneys' fees, litigation expenses and court costs under California Civil Code § 56.35.

## COUNT VIII

### California Unfair Competition Law

### Cal. Bus. & Prof. Code §17200 *et seq*.

### *(On Behalf of Plaintiff and the Nationwide Class)*

279.   Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint, as if fully set forth herein.

280.   Defendant is a "person" defined by Cal. Bus. & Prof. Code § 17201.

281.   Defendant violated Cal. Bus. & Prof. Code § 17200 *et seq*. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

282.   Defendant's "unfair" acts and practices include:

    a.   Defendant failed to implement and maintain reasonable security measures to protect Plaintiff's and Class Members' personal information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach. Defendant failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents and known coding vulnerabilities in the industry;

    b.   Defendant's failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act (15 U.S.C. § 45), California's Customer Records Act (Cal. Civ. Code § 1798.80 et seq.), and California's Consumer Privacy Act (Cal. Civ. Code § 1798.150);

c.     Defendant's failure to implement and maintain reasonable security measures also led to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Defendant's inadequate security, consumers could not have reasonably avoided the harms that Defendant caused; and

d.     Engaging in unlawful business practices by violating Cal. Civ. Code § 1798.82.

283.   Defendant has engaged in "unlawful" business practices by violating multiple laws, including the FTC Act, 15 U.S.C. § 45, and California common law.

284.   Defendant's unlawful, unfair, and deceptive acts and practices include:

a.     Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' personal information, which was a direct and proximate cause of the Data Breach;

b.     Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c.     Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.     Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' personal information, including by implementing and maintaining reasonable security measures;

e.     Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45 and HIPAA;

f.     Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' personal information; and

g.     Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining

CLASS ACTION COMPLAINT

to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

285.   Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' personal information.

286.   As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff and Class Members were injured and lost money or property, which would not have occurred but for the unfair and deceptive acts, practices, and omissions alleged herein, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their personal information.

287.   Defendant's violations were, and are, willful, deceptive, unfair, and unconscionable.

288.   Plaintiff and Class Members have lost money and property as a result of Defendant's conduct in violation of the UCL, as stated herein and above.

289.   By deceptively storing, collecting, and disclosing their personal information, Defendant has taken money or property from Plaintiff and Class Members.

290.   By deceptively storing, collecting, and disclosing their personal information, Plaintiff and Class Members overpaid Defendant for services that did not include proper data security for their Private Information.

291.   Plaintiff and Class Members would not have provided their Private Information to Defendant or paid Defendant money for services if Plaintiff and Class Members had known that Defendant's data security measures were inadequate to protect their Private Information.

CLASS ACTION COMPLAINT

292.   Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and Class Members' rights.

293.   Plaintiff and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their personal information; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

## COUNT IX

### Declaratory Judgment and Injunctive Relief
### (*On behalf of Plaintiff & the Nationwide Class*)

294.   Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

295.   Plaintiff brings this claim individually and on behalf of the Class.

296.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

297.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff's and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her PII and PHI and remains at imminent risk that further compromises of her PII and PHI will occur in the future.

64

298.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.      Defendant owes a legal duty to secure patients' PII and PHI and to timely notify patients of a data breach under the common law, Section 5 of the FTC Act, and HIPAA; and

      b.      Defendant continues to breach this legal duty by failing to employ reasonable measures to secure patients' PII and PHI.

299.   This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect patients' PII and PHI.

300.   If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant's properties.

301.   The risk of another such breach is real, immediate and substantial.

302.   If another breach of Defendant's store of patient data occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

303.   The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

304.   Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendant [what], thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## <u>COUNT X</u>

### Unjust Enrichment

### (<u>*On behalf of Plaintiff & the Nationwide Class*</u>)

305.   Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein, and pleads the following count in the alternative.

306.   Plaintiff brings this claim individually and on behalf of the Class.

307.   Upon information and belief, Defendant funded its data security measures from its general revenue including payments made by or on behalf of Plaintiff and Class Members.

308.   As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

309.   Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased healthcare services from Defendant and/or their agents and in so doing provided Defendant with their PII and PHI.

310.   In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII and PHI protected with adequate data security.

311.   Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII and PHI of Plaintiff and Class Members for business purposes.

312.   In particular, Defendant enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members PII and PHI. Instead of providing a reasonable level of data security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits and the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures.

66

313.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement appropriate data management and security measures that are mandated by their common law and statutory duties.

314.   Defendant failed to secure Plaintiff and Class Members' PII and PHI and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members conferred upon Defendant.

315.   Defendant acquired Plaintiff's and Class Members' PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

316.   If Plaintiff and Class Members knew that Defendant had not reasonably secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendant.

317.   Plaintiff and Class Members have no adequate remedy at law.

318.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injuries, including:

    a.   Theft of their PII and/or PHI;

    b.   Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

    c.   Costs associated with purchasing credit monitoring and identity theft protection services;

    d.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

    f.   The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

CLASS ACTION COMPLAINT

g.     Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.     Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.     Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j.     The diminished value of the services they paid for and received; and

k.     Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

319.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

320.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and other Class Members, prays for judgment against Defendant as follows:

A.     an Order certifying the Nationwide Class and California Sub-Class, and appointing Plaintiff and her Counsel to represent the

68

CLASS ACTION COMPLAINT

Classes;

B.    equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.    injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.    an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.    an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.    prejudgment interest on all amounts awarded and

G.    all such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of herself and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.

Dated: April 9, 2024

Respectfully Submitted,

*/s/ John R. Parker, Jr.*
John R. Parker, Jr.
California Bar No. 257761
**ALMEIDA LAW GROUP LLC**
3550 Watt Avenue, Suite 140
Sacramento, California 95821
Tel: (916) 616-2936
jrparker@almeidalawgroup.com

69

CLASS ACTION COMPLAINT